UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LEILEI LIN,<br><br>    Plaintiff,<br><br>v.<br><br>HENRY FORD HEALTH SYSTEM,<br><br>    Defendant. | Case No. 18-13870<br>Honorable Laurie J. Michelson<br>Magistrate Judge R. Steven Whalen |

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]

Leilei Lin claims he was repeatedly disciplined and ultimately terminated from his job as an imaging technician at Henry Ford Health System ("Henry Ford") because he is Chinese and because he complained about his treatment. Henry Ford presents a very different story, revealing that Lin had numerous performance issues and incidents of misconduct which forced Henry Ford to discipline him—and, when that discipline failed to improve his performance and behavior, to terminate him.

Lin sued Henry Ford for discrimination and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (as amended), and Michigan's Elliott-Larsen Civil Rights Act (ELCRA). Henry Ford now seeks summary judgment, arguing that Lin's claims have no factual basis. For the reasons that follow, the Court agrees and grants Henry Ford summary judgment on all claims.

## I.

## A.

Lin was born in China and his native language is Mandarin Chinese. (ECF No. 14-2, PageID.89, 124.) He became a U.S. citizen in the early 2000s. (ECF No. 14-2, PageID.89.)

In January 2012, Lin began working in the imaging department of Henry Ford Hospital, West Bloomfield,  as a Level 1 technician; in that role, he serviced and repaired X-ray machines, CT scanners, MRI machines, and similar devices. (ECF No. 14-2, PageID.93.) About a month into his employment, Lin began reporting to manager Russell ("Rusty") Irons. (ECF No. 14-2, PageID.94.) Lin and Irons got along well for the most part. (*Id.*) But Lin claims that from the beginning Irons would joke with Lin that his English was better than Irons' Chinese. (*Id.*)

Lin had his first performance review at the end of 2012. (ECF No. 14-3, PageID.147.) Irons evaluated Lin in 10 categories and gave him a score of 3 (meets expectations) or 4 (exceeds expectations) in all categories. (*Id.* at PageID.147–150.) By comparison, Lin rated himself a 5 (outstanding) in all categories. (*Id.*) Irons' evaluation mentioned some challenges and areas of improvement for Lin, including that Lin needed to be clearer in his explanations when completing paperwork for his repairs and to continue to work on his relationship with a coworker named Tom LaRock. (*Id.* at PageID.148–149.) Irons also made multiple references to Lin's communication difficulties, noting that speaking more slowly and clearly was "the one area that you need the most improvement" (*id.* at PageID.148) and that "more work on your communication verbal and written is needed to help you succeed" (*id.* at PageID.149). Irons also noted that Lin was having difficulties with the radiology manager, Sherry Johnson, because she could not understand Lin. (*Id.* at PageID.147.)

In his deposition, Lin claimed he was the best technician at Henry Ford and that he was the only technician who could work on mammography and fluoroscopy machines. (ECF No. 14-2, PageID.104.) Irons acknowledged that Lin was technically skilled. (ECF No. 14-5, PageID.306.) Irons even said, "[Lin] could have been my best guy, but he was unwilling to make any adjustments." (ECF No. 14-5, PageID.311.)

When asked about the critiques in his performance reviews, Lin claimed that no customers (i.e., hospital departments using diagnostic equipment) had a problem with him and they were all very happy with his work. (ECF No 14-2, PageID.95–96.) Lin also stated that because he had been working for 15 to 20 years, he knew there was no problem with how he did his paperwork, but acknowledged that Irons wanted it done a different way. (*Id*. at PageID.95.) Lin said there were no problems in his relationship with LaRock but that Lin did 75 percent of the work and LaRock did only 25 percent. (*Id.* at 95–96.)

**B.**

In the spring of 2013, Lin learned there was a Level 2 for imaging technicians and threatened to quit if he was not promoted. (ECF No. 14-2, PageID.107.) Lin was given necessary CT scanner training and was then promoted to a Level 2 technician. (*Id*.)

A Level 2 technician performs preventative and corrective maintenance and safety testing on imaging equipment and maintains documentation in accordance with department policy. (ECF No. 14-1, PageID.63; ECF No. 14-2, PageID.143.) The Level 2 technician job description includes requirements that the technician maintain documentation in accordance with department policy, display good customer service skills, and demonstrate teamwork and flexibility. (ECF No. 14-2, PageID.143–144.)

3

Lin's colleague Benjamin Amos was hired directly as a Level 2 technician despite having fewer years of experience with medical imaging devices than Lin. (ECF No. 14-6, PageID.379.) And Amos is white. But Amos did have nearly fifteen years of experience in imaging generally when he was hired. (ECF No. 14-6, PageID.379–380.) And Amos was later promoted to team leader. (*Id.* at PageID.380.)

### C.

In 2013, according to Irons, after Lin continued to struggle with communication. Irons twice provided Lin with email scripts he could use to communicate with the radiology department and others who continued to complain about his communication and documentation. (ECF No. 14-3, PageID.155, 161.) It is unclear whether Lin ever used these scripts.

At the end of 2013, Irons reviewed Lin's performance. While Irons thought Lin had improved his communication to some extent, he once again raised "being able to speak and write the English language" as Lin's "#1 greatest challenge." (ECF No. 14-3, PageID.169.) Lin gave himself the rating of 4 ("role model") in every performance category, whereas Irons rated him a mix of 4s, 3s and a 2. (ECF No. 14-3, PageID.168-170.) Irons praised Lin's "can do" attitude, his flexibility, and his efforts to help others. (*Id.*) Irons noted that Lin still had a strained relationship with LaRock, but that there had been some improvement. (*Id.* at PageID.168.)

Lin later recalled that although sometimes his English was not clear, his English level did not cause any problems with his job. (ECF No. 14-2, PageID.101.) But Lin admitted that "nearly everyone who worked with [him] would complain about his accent." (ECF No. 16, PageID.415.) Irons received complaints from Sherry Johnson, a supervisor in the radiology department, about Lin's communication around work orders. (ECF No. 14-5, PageID.309; ECF No. 14-3, PageID.158–165.) Irons also said he received complaints from some "very upset" mammography

customers, which caused the program to shut down because the customers "just felt that he did not display [] proficiency." (ECF No. 14-5, PageID.314.) Amos also noted that he had trouble with Lin's accent and "it could be very difficult to understand exactly what he was getting at." (ECF No. 14-6, PageID.382.)

For his 2014 end-of-year performance review, Lin rated himself a 5 ("leader/change agent") across the board (apparently seven categories). (ECF No. 14-3, PageID.175.) Irons gave him two 4s and five 3s. (*Id.* at PageID.175–176.) Irons praised Lin's quick responses to customers, his innovative ideas, and his sensitivity to privacy. (*Id.*) Irons noted that Lin had made extra effort to improve his English and his communication "is becoming better each year." (*Id.* at PageID.176.) Irons highlighted a few problem areas, including that Lin did not always respect the ideas and opinions of his co-workers and that he still needed to include more details in his documentation of work orders. (*Id.* at PageID.175–176.)

### D.

But things changed in the new year. In the spring of 2015, the imaging department was reorganized and four new Level 3 technician positions were created. (ECF No. 14-5, PageID.312.) In addition to more training, the Level 3 technician position required the ability to mentor other people, to write procedures, to work with original equipment manufacturers, and to improve internal processes. (*Id.*) All Level 2 technicians were invited to apply. (*Id.* at PageID.313.) When the department announced the new positions, Lin responded in an email: "My understanding is that I will be promoted to a Level III. Looking forward to it." (ECF No. 14-3, PageID.181.) Irons responded and clarified that nothing would be automatic and that Lin needed to apply for the promotion and meet the criteria of the position. (*Id.* at PageID.182.) Lin stated he assumed he would get promoted because he "had the most experience, he was capable of working on the most

machines, he was already training everyone, and he was the most technically skilled technician."
(ECF No. 16, PageID.415.)

Irons asked each technician who applied for the Level 3 position to provide work orders
for review. (ECF No. 14-5, PageID.313.) Because technicians were required to complete work
orders after each equipment repair, they could be used to evaluate each applicant's level of
communication and compliance with documentation policies. (*Id.* at PageID.313, 316.)

Irons said that he emailed Lin prior to his interview to remind him to submit his work
orders since he had not yet done so. (*Id.*) According to Irons, Lin neither submitted the orders nor
brought them to the interview. (*Id.*) Irons said that Lin did offer to provide the paperwork later,
but Irons told him it was too late. (*Id.*) As for Lin's side of the story, he could not remember if he
had emailed the orders ahead of time, but he insisted that he brought the orders to the interview
and that Irons told him during the interview that his paperwork was all complete. (ECF No. 14-2,
PageID.109–110.) Irons recalled that Lin was argumentative during the interview and very
confident that he was the most skilled technician; Irons explained that the job was not just about
technical skills, but also about the ability to communicate, document, and have good customer
relations. (ECF No. 14-5, PageID.313–314.)

On May 28, 2015, the department announced the technicians who were promoted to Level
3—and Lin was not one of them. (ECF No. 14-3, PageID.188–189.) The announcement noted that
"if you were not complete in the work order or other materials it did affect your score." (*Id.* at
PageID.189.) Irons also emailed Lin individually and told him that "if this position was only based
on technology you would have qualified," but that they were also looking for mentoring and
process improvement, and his lack of work orders "did not allow us to see where you were
performing these functions." (*Id.* at PageID.188.) Lin, who was "very angry" and "unhappy,"

6

appealed the decision to human resources. (ECF No. 14-2, PageID.110; ECF No. 14-3, PageID.196.) In his email to HR, Lin stated that he was "not treated equally and fairly." (ECF No. 14-3, PageID.197.) HR manager Kristen Harland replied to Lin's email and offered to set up a time to talk. (ECF No. 14-3, PageID.196.) In a follow-up email, Harland referenced the 45-minute conversation between herself and Lin. (*Id.*) But Lin claimed in his deposition that Harland lied because they never had a discussion and that she got upset with him when he tried to talk to her about his concerns. (ECF No. 14-2, PageID.113.)

One of the people who did get a Level 3 position was Dan Solocinski. (ECF No. 14-3, PageID.190.) Irons admitted that Lin had more technical skills than Solocinski (ECF No. 14-5, PageID.318), but noted that Solocinski was superior in paperwork and mentorship skills (*id.* at PageID.317). Lin claimed that even after Solocinski was promoted, Lin had to help him because he could not do his job and Solocinski called Lin for technical support. (ECF No. 14-2, PageID.116.)

**E.**

A few months later, in August 2015, Irons gave Lin a formal corrective action. According to the corrective action, Lin had told people that Solocinski was not capable of his job loud enough for Solocinski to hear, which, according to Solocinski, created a hostile workplace. (ECF No. 14-3, PageID.203.) Lin later denied speaking to others about Solocinski's abilities, but also stated twice in his deposition that Solocinski "cannot do his job." (ECF No. 14-2, PageID.116.) The corrective action also noted that Lin had ignored requests to use the group calendar and that he was improperly taking calls directly from customers rather than routing them through the call center. (ECF No. 14-3, PageID.203.) The corrective action noted that failure to comply could result in time off or dismissal. (*Id.*) Lin acknowledged getting the corrective action, but he denied all the

underlying conduct and claimed Irons was not telling the truth. (ECF No. 14-2, PageID.117.) Regarding the calls, Lin stated in his deposition "if they call me, it's not my fault because [Solocinski] cannot fix things." (ECF No. 14-2, PageID.117.)

On October 30, 2015, Irons issued Lin another corrective action for failing to report his whereabouts and improperly documenting calls. (ECF No. 14-3, PageID.204.) Irons told Lin to begin reporting to the main campus in Detroit and that he was being placed on a performance improvement plan (PIP). (ECF No. 14-3, PageID.204.) Irons stated that he decided to move Lin to separate him from Solocinski and so that Irons and Amos could more carefully monitor Lin. (ECF No. 14-5, PageID.317; ECF No. 14-6, PageID.388.) Lin filed an appeal of the corrective action with HR. (ECF No. 14-2, PageID.119–120.) Lin then went to Wisconsin for two weeks of training. (*Id.* at PageID.120.)

When Lin returned on November 16, he met with Irons and Amos. (*Id.* at PageID.121.) Irons told Lin that he had to begin reporting to main campus, but Lin refused, insisting that HR had told him he did not need to leave West Bloomfield while his appeal was pending. (*Id.* at PageID.121.) According to Irons, Lin turned his back to Irons in the middle of their discussion and then abruptly left the meeting. (ECF No. 14-5, PageID.323.) Lin admitted in his deposition that he left in the middle of the meeting, but claimed he left to go talk to HR to clear up the confusion. (ECF No. 14-2, PageID.119, 121.) Lin claimed that he got an email from the Macomb HR saying he did not need to report downtown while his appeal was pending, but that he did not save the email. (ECF No. 14-2, PageID.121.) Email records show that Harland, the HR manager, emailed Lin on the morning of November 16 and told him "you are [to] report to Main Campus for the next 30 days to get specific training. . . . If you do not follow through with his request you will receive a corrective action and will be at risk for termination." (ECF No. 14-3, PageID.214.)

Later that day at the main hospital repair shop, Lin approached Irons, shouting "liar, liar." (ECF No. 14-5, PageID.321.) Lin admitted to calling Irons a liar and insisted that was because Irons *was* lying. (ECF No. 14-2, PageID.122.)

Lin received two corrective actions for his behavior on November 16. (ECF No. 14-3, PageID.205–206.) As is the case with all of the corrective actions Lin received, the document advised that failure to comply with the prescribed actions and standard of conduct "may result in unpaid time off or your dismissal." (ECF No. 14-3, PageID.205.) After that day, Lin complied and began reporting to the Detroit location. (ECF No. 16, PageID.419.)

Lin's 2015 Year End Review reflected his behavioral issues, which had intensified after he was not promoted. (ECF No. 14-3, PageID.208.) Lin continued to rate himself a 4 or 5 in each category, but this time Irons rated him a 1, 2, or 3 in each category. (*Id.*) For the category "Commitment to Team Members," Irons rated Lin a 1 (Does Not Meet Expectation) and wrote "Your peer relationships have been substandard. . . . [T]here are many times where you have not treated people well and this has made it very hard to work with you." (*Id.*) In explaining his rating of 2 (Unsuccessful) in the category "Display a Positive Attitude/Take Pride in the System," Irons noted that "[l]ast year you had a good attitude right up until you were not promoted to a level 3. At that point things became very poor." (*Id.*) Irons rated Lin a 3 (Fully Successful) in the categories of "Foster and Support Innovation," "Respect and Be Sensitive to Privacy/Confidentiality & Maintain a Clean, Safe and Healthy Workplace Environment," and "Take Ownership and Be Accountable/Respond in a Timely Manner." (*Id.* at PageID.209–210.) Irons rated Lin a 2 (Unsuccessful) in the final two categories. For "Honor and Respect Diversity," Irons noted, "I would like to see you improve on being able to show respect to people who you do not necessarily agree with and try to understand the perspectives of others." (*Id.* at PageID.209.) And for "Offer

Open and Constructive Communications," Irons commented, "I understand that you struggle at times with English . . . this needs to improve as I still get customers who complain about the language barrier and there are times that I am not sure you are understanding what is being written or said." (*Id*.)

**F.**

The imaging department was reorganized around January 2016 and a new director of imaging, Makidah Mahdi, was hired. (ECF No. 14-5, PageID.294.) Mahdi decided to cancel Lin's PIP so she could get to know him and give him a fresh start before deciding if a PIP was the appropriate action. (ECF No. 14-5, PageID.321; ECF No. 14-2, PageID.119.)

In early December 2016, Irons referred Lin to the employee assistance program (EAP) because of all his behavioral issues and because Irons thought he seemed very unhappy. (ECF No. 14-5, PageID.322.) The EAP referral referenced a number of issues with Lin, including "disappearing from the shop," "insubordinate behavior and disrespect," "sleeping on the job," "changing of your work schedule," and "leaving from work early without permission." (ECF No. 14-4, PageID.222.) Lin denied sleeping on the job or that he was insubordinate or disrespectful to coworkers. (ECF No. 14-2, PageID.126.) Lin went to EAP once, but according to him, the counselor said Lin did not have any issues. (ECF No. 14-2, PageID.125.)

In August 2016, Lin filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging national origin discrimination and retaliation. (ECF No. 16-9, PageID.458.) Specifically, Lin stated he was denied a promotion because he was Chinese-American and was placed on the PIP and transferred in retaliation for raising concerns over the promotion process. (*Id.*) Lin claimed that Irons yelled at him in front of other employees for filing the complaint and said he would never be allowed to return to the West Bloomfield location. (ECF

No. 14-2, PageID.136.) Irons denied discussing the complaint with Lin at all. (ECF No. 14-5, PageID.331.)

### G.

Seven months later, in March 2017, Irons and the HR manager, Harland, notified Lin that he was being put on a new PIP approved by Mahdi. (ECF No. 14-2, PageID.127.) The PIP included a number of areas in which Lin needed improvement. (ECF No. 14-4, PageID.226.) These areas included properly documenting all service calls, better communication with coworkers and customers, responding in a timely manner, improving teamwork, and meeting deadlines. (*Id.*at PageID.226–228.) When later asked about these critiques, Lin denied being deficient in any of these areas, but acknowledged that these were topics management had been critical of since 2013. (ECF No. 14-2, PageID.127.) Irons stated that Lin believed he did not need any improvement and that he largely laughed at the idea of the PIP. (ECF No. 14-5*, at PageID.325–326.) Irons and Amos met with Lin weekly to go over the goals in his PIP. (*Id.* at PageID.326.)

In May 2017, Lin received another corrective action. (ECF No. 14-4, PageID.230.) This one was for unsafe practices involving a portable X-ray machine and an angry outburst directed at the radiology department manager. (*Id.*) Lin denied failing to comply with the safety procedures. (ECF No. 14-2, PageID.129; ECF No. 14-4, PageID.237–238.) And Lin said it was the manager who yelled at him, that he did not raise his voice, but "maybe my voice is louder than normal people." (ECF No. 14-2, PageID.129; ECF No. 14-4, PageID.238.) Lin also suggested his loud voice might be connected to his Asian culture. (ECF No. 14-4, PageID.237.) Lin formally appealed the corrective action. (ECF No. 14-4, PageID.243.) On his appeal form, Lin alleged that he was being treated unfairly and noted that he believed his coworkers were taking advantage of the fact that he was not a native English speaker. (*Id.*)

Lin later elaborated on this point, claiming that others, specifically George Aawad, had the same issues as him but was not disciplined. (ECF No. 19, PageID.545.) But Henry Ford contests this. Irons stated that although other employees had isolated issues, the problem with Lin was that he refused to take ownership and could not be coached to prevent repeating his mistakes. (ECF No. 14-5, PageID.325.) Irons also testified about Aawad, who at the time of the deposition was having issues with teamwork similar to those Lin had years before. In his deposition, Irons said he would pursue the same disciplinary path with Aawad as he did with Lin if Aawad's behavior did not improve. (ECF No. 14-5, PageID.325.)

Beyond the X-ray machine incident, Lin had mixed results while on the PIP. Amos reported that Lin "show[ed] quite a bit of improvement" in the first two weeks. (ECF No. 14-6, PageID.390.) And Irons noted that Lin improved in some areas, such as putting some items on the calendar and occasionally working well with other team members. (ECF No. 14-5, PageID.327.) But in the end, there was still a 50/50 split in things he did well and things that needed improvement, according to Irons. (*Id.*) Irons said, "if we had to give him a numerical grade, it would be a 50, which isn't really passing any place I know of." (*Id.*) And Amos noted that although Lin had shown improvement in some areas, he did not show "the broad, vast improvement [Amos] would have liked to have seen" and his attitude continued to affect his performance. (ECF No. 14-6, PageID.391–392.) Since the PIP had already been extended to 90 days (versus the typical period of 30 to 60 days), Irons did not feel that Lin would improve. (ECF No. 14-5, PageID.327.) As a result of failing the PIP, Lin was suspended for one day in July, but he remained employed until later that year. (ECF No. 14-6, PageID.368, 392.)

12

## H.

Irons stated that he continued to work with Lin for as long as he could, but it "got to the point where his inability to sustain compliance snowballed." (ECF No. 14-5, PageID.332; ECF No. 14-4, PageID.274.) At the beginning of October 2017, Irons gave Lin another corrective action for continuous "poor quality documentation and errors in his work order notes." (ECF No. 14-4, PageID.245.) The action was also issued because Lin ordered a new ultrasound video board without checking that it was the correct part. (*Id*.) As a result, the equipment vendor had to do the repair and several patients had to be rescheduled, costing more than $3,700. (*Id*.; ECF No. 14-4, PageID.277.) The action stated, "Leadership has made many attempt[s] to re-educate the employee, retrain the employee, and the employee performance fails to meet the minimum standards as required by his job description." (ECF No. 14-4, PageID.245.) When later asked about this allegation, Lin responded that Irons is a liar. (ECF No 14-2, PageID.131.)

Ultimately, Irons characterized the decision to terminate Lin as "death by a thousand cuts." (ECF No. 14-5, PageID.332.) After Lin's numerous corrective actions, and his failure to sufficiently improve on the PIP, Irons concluded: "it just got to the point where his inability to sustain compliance snowballed." (*Id.*) Irons further noted that Lin had displayed "a consistent, overwhelming lack of accountability." (*Id.*) Amos stated that Lin was "ultimately terminated because . . . even after the initial write-up for failing the PIP, there was continued corrective actions after that." (ECF No. 14-6, PageID.392.) Amos commented that Lin suffered from both attitude and performance issues and theorized that "maybe the attitude drove the performance issue because he felt that he didn't have to do the performance issues because of his attitude." (ECF No. 14-6, PageID.392.)

On the day of Lin's termination, October 30, 2017, management was worried about how he would react, so they cleared all of the other employees out of the shop. (ECF No. 14-5, PageID.332.) Irons, Amos, and HR met with Lin for about 20 minutes. (ECF No. 14-5, PageID.333.) Irons reported that Lin didn't seem to care and just said they would be hearing from his lawyer. (*Id.*)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And "a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

When, as here, defendants seek summary judgment, the Court takes the facts in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

## A.

Lin asserts in Count I of his complaint that Henry Ford deprived him of the benefits and privileges of his employment contract in violation of 42 U.S.C. § 1981. (ECF No. 1, PageID.7.)

But § 1981 does not apply to the conduct alleged in this case. Section 1981 prohibits discrimination in the formation and enforcement of employment contracts. The Supreme Court held that § 1981 does not cover conditions of employment. *Patterson v. McLean Credit Union*,

491 U.S. 164, 177 (1989). And the Sixth Circuit extended *Patterson* to find that § 1981 does not apply to discharge cases. *Prather v. Dayton Power & Light Co.*, 918 F.2d 1255, 1257 (6th Cir. 1990). Lin does not assert any discriminatory conduct in the formation of his employment contract with Henry Ford. So Henry Ford is entitled to judgment as a matter of law on Lin's § 1981 claim.

**B.**

The Court next addresses Lin's claims that Henry Ford discriminated against him on account of his national origin and his race. (ECF No.1, PageID.7–10; ECF No. 16, PageID.422.) Title VII of the Civil Rights Act prohibits an employer from discriminating against an individual with respect to any term, condition, or privilege of employment because of the individual's race, national origin, and other protected characteristics. 42 U.S.C. § 2000e–2(a)(1). Lin asserts that his discrimination claims are supported by both direct and circumstantial evidence.

These claims can be analyzed using one of three methods. Selecting the proper method turns on whether the employee advances a single-motive theory (the adverse action occurred because of discrimination) or a mixed-motive theory (although non-discriminatory reasons motived the adverse action, so did discrimination). It also turns on whether the employee offers "direct" or "indirect" (i.e., circumstantial) evidence of discrimination in support of her theory.

When an employee advances a single-motive theory supported by "indirect" evidence of discrimination, the employee typically resorts to the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 n.10 (6th Cir. 2008). But when the employee offers "direct" evidence in support of her single-motive theory, the *McDonnell Douglas* framework does not apply. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776, 784 n.6 (6th Cir. 2016); *Terbovitz v. Fiscal Court of Adair Cty.*, 825 F.2d 111, 114 (6th Cir. 1987) (explaining why *McDonnell Douglas* is not

necessary with direct evidence of discrimination), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). So a claim pursued under a single-motive theory has two modes of analysis. A third method of analysis is used to decide whether a mixed-motive claim should proceed to a jury. *See White*, 533 F.3d at 400. Lin appears to advance his claims under a single-motive theory.[1] The Court will address his direct evidence and circumstantial evidence theories.

### 1.

Lin first argues that he has presented direct evidence of discrimination. Lin points to comments and complaints made by coworkers about his accent. First, Lin asserts that Irons would sometimes joke that Lin's English was better than Irons' Chinese. (*See* ECF No. 14-2, PageID.94.) Lin also notes that his performance reviews criticized his accent and that Irons admitted Lin did not get promoted to Level 3 in part because of his communication issues. Finally, Lin adds that "Nearly everyone who worked with [him] would complain" about his communication or accent. (ECF No. 16, PageID.423.)

Lin argues that these facts are direct evidence of accent or language discrimination, which is actionable as national origin discrimination. (*Id.* at PageID.424.)

"Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kuhn v. Washtenaw*

---

[1] The only mention of mixed motives in Lin's summary-judgment brief is in a quote related to direct evidence of discrimination. (ECF No. 16, PageID.422.) So to the extent that Lin intended to also argue a mixed-motive theory, he has failed to sufficiently make this argument and it is forfeited. *See United States v. Robinson,* 390 F.3d 853, 886 (6th Cir. 2004) ("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," are forfeited, "and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (brackets, ellipsis, citation, and internal quotation marks omitted)); *see also Wallace v. Leidos Innovation Corp.*, No. 19-5512, 2020 WL 1490751, at *4 (6th Cir. March 27, 2020).

*Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) (internal citations omitted). If an additional inference is required, the evidence is circumstantial, not direct. *See Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005).

So evidence that an employer took adverse action against an employee because of his accent "can constitute direct evidence of national origin discrimination" when that evidence shows "an unmistakable intent to discriminate upon national origin." *Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019). *See, e.g.*, *In re Rodriguez*, 487 F.3d at 1009 (finding direct evidence where employer said he would have promoted the Hispanic plaintiff "but for" the plaintiff's "Hispanic speech pattern and accent"); *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (offering as an example of direct evidence of discrimination an employer saying "I fired you because you are disabled."); *see also Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) ("Only the most blatant remarks, whose intent could be nothing other than to discriminate . . . satisfy this criteria." (internal citations and alterations omitted)). On the other hand, "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005).

Turning to Lin's alleged direct evidence, although arguably in bad taste, Irons' joke to Lin about Lin's language abilities was innocuous and does not suggest that Irons was biased against Lin. *See White*, 429 F.3d at 239. In fact, Irons' comment could suggest that Lin has superior language abilities, in that he is able to communicate in two languages while Irons can only speak one.

The other comments about his accent and language that Lin cites as direct evidence of discrimination were all made in connection with his job performance. Lin himself admits that "nearly everyone" complained about difficulties communicating with him. (ECF No. 16,

PageID.423.) And the ability to communicate with customers and coworkers was part of Lin's job description. (*See* ECF No. 14-2, PageID.143–144.) The Sixth Circuit has made clear that "[u]nlawful discrimination does not occur . . . when a plaintiff's accent affects his ability to perform the job effectively." *Ang*, 932 F.2d at 549 (citing *Fragante v. City & Cty. of Honolulu*, 888 F.2d 591, 597 (9th Cir. 1989)).

Moreover, the record reflects that, rather than taking adverse action against Lin because of his accent, Irons, upon multiple occasions, offered Lin support and resources to help him improve his communication difficulties. (*See* ECF No. 14-3, PageID.155, 161.)

In sum, the comments about Lin's language and accent made by his coworkers cannot be direct evidence of discrimination because they require an additional inference: that the comments did not reflect concern that Lin's language abilities were negatively impacting his job performance, but instead showed an intent to discriminate against him because he was Chinese.

## 2.

In the absence of direct evidence of discrimination, Lin argues that he can prove his termination was the result of national origin and racial discrimination through indirect evidence under the *McDonnell Douglas* framework. (ECF No. 16, PageID.425.) Lin first has the burden to demonstrate a prima facie case of race or national origin discrimination; the burden then shifts to Henry Ford to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to Lin to show the offered explanation is pretext for discrimination. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012).

Henry Ford does not dispute that Lin can demonstrate a prima facie case of discrimination.

As for the second step of the *McDonnell Douglas* framework, Henry Ford argues that Lin "was fired after a series of incidents and customer complaints indicated that he was not making

progress despite being placed on PIP." (ECF No. 14-1, PageID.80.) Henry Ford offers documentary evidence and testimony from two of Lin's supervisors to support this explanation. This explanation—that the company fired Lin for legitimate performance-based reasons—is sufficient to meet Henry Ford's burden of production. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment.").

So the burden shifts back to Lin to show Henry Ford's proffered reason was pretextual by demonstrating, for example, that the reason "(1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Id.* at 586.

Lin's brief does not specify which approach he pursues and cites to some cases that follow the first approach, and others that follow the second. (*See* ECF No. 16, PageID.431.) But at bottom, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). In the summary judgment context, Lin must produce "sufficient evidence from which the jury could reasonably reject [Henry Ford's] explanation and infer that [Henry Ford] intentionally discriminated against him." *Upshaw*, 576 F.3d at 586 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). Lin does not satisfy this burden.

First, Lin "denies the plethora of allegations Defendant has made against him" (ECF No. 16, PageID.432), and argues that "the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false,'" *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Under this approach, Lin "must allege more than a dispute over the facts upon which his discharge was based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir.

2001). Lin must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Lin relies solely on his own denials of the conduct that Henry Ford points to as justification for his termination. But he fails to present any evidence to support his bare assertions that Henry Ford's proffered reasons were false or that discrimination was the real reason for his termination. On the other side of the scale, Henry Ford presents documentation of Lin's subpar work performance and misconduct spanning the entire length of Lin's employment, including year-end reviews documenting performance issues, five corrective actions, and testimony from two of Lin's supervisors. Summary judgment is appropriate when the plaintiff "'only create[s] a weak issue of fact as to whether the defendant's reason [is] untrue' and there is ample evidence to support the employer's position." *McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 F. App'x 461, 470 (6th Cir. 2018) (quoting *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 504 (6th Cir. 2007)).

Lin also seems to argue that even if some of the allegations of misconduct are true (for example, Lin admits to walking out on Irons during a meeting and calling Irons a liar, although he argues his actions were justified), they did not actually motivate his termination. For this approach, Lin must show that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext." *Manzer*, 29 F.3d at 1084. Lin argues that despite any previous misconduct, he had been making performance improvements while on the PIP and that Henry Ford "waited around for a fortuitous reason to terminate" Lin. (ECF No. 16, PageID.432.) Lin also points out the fact that Irons admitted Henry Ford was careful in its approach to terminating Lin because he had threatened to sue them. (ECF No. 14-5, PageID.332.) But even if this is true, that is, if Henry Ford was motivated by other reasons that were lawful, "the issue of pretext would be immaterial, making summary judgment appropriate."

*Jones v. Potter*, 488 F.3d 397, 408–09 (6th Cir. 2007). Lin must still point to evidence that Henry Ford was motivated by his race or national origin, which he fails to do.

No matter which approach Lin takes, he fails to carry his burden to establish pretext because he does not present any evidence that his race or national origin played any part in his termination. *See Manzer*, 29 F.3d at 1085. Indeed, when asked in his deposition why he thought he was being discriminated against because he is Chinese, Lin vaguely said "because I can feel it." (ECF No. 14-2, PageID.133.) Lin's unsupported belief is insufficient to rebut Henry Ford's extensive documentation of his performance and attitude issues throughout his employment. So Lin's discrimination claims under Title VII fail, and summary judgment is appropriate.

### 3.

Thus far, the Court has applied only Title VII law in addressing Lin's claims of national-origin and race discrimination. Although the framework is largely the same, there may be differences between a claim under Title VII and one under ELCRA. But if there are, neither party has raised them. Instead, both parties assert that the same result is required under Title VII and ELCRA. *See, e.g.*, *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) ("Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."). So based on the Court's Title VII analysis, the Court finds that Henry Ford is entitled to summary judgment on Lin's claims of discrimination under ELCRA.

### C.

The Court next turns to Lin's claim of retaliation. (ECF No. 1, PageID.10, 13.)

Title VII prohibits retaliation against an employee who (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42

U.S.C. § 2000e–3(a). The "opposition clause" has been interpreted by the Sixth Circuit to protect not only formal complaints to the EEOC or a similar state agency, but also complaints to management or human resources and "less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

As with discrimination claims, a plaintiff can prove a retaliation claim under Title VII with either direct or indirect evidence. Because Lin asserts retaliation based on indirect evidence, his claims are evaluated under the same three-step framework based on *McDonnell Douglas*. *See EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).

First, Lin must establish a prima facie case of retaliation. If Lin can establish a prima facie case of retaliation, the burden shifts to Henry Ford "to proffer some legitimate, nonretaliatory reasons for its actions." *Id.* (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). Finally, if Henry Ford satisfies its burden, in the third step, Lin "must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

At the summary judgment stage, "a defendant will be entitled to summary judgment so long as nondiscriminatory factors were sufficient to justify its ultimate decision." *Redlin*, 921 F.3d at 615 (internal quotation marks and alterations omitted) (quoting *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014)). Henry Ford argues it is entitled to summary judgment on Lin's retaliation claims because there is sufficient evidence to show its employment decisions were based on nondiscriminatory factors and Lin cannot establish either causation or pretext.

**1.**

For Lin to establish a prima facie case of retaliation he must demonstrate that: (1) he engaged in activity protected by Title VII; (2) Henry Ford knew of Lin's protected activity; (3) thereafter, Henry Ford took adverse action against Lin; and (4) a causal connection existed between the protected activity and the materially adverse action. *Redlin*, 921 F.3d at 615 (citing *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir.2013)).

Lin alleges he can establish a prima facie case of retaliation based on two protected acts, one in 2015 and one in 2016.

The first is that Lin's performance ratings became more negative after he complained to HR about not being promoted to Level 3 technician. (ECF No. 16, PageID.429–430.) Because Henry Ford does not contest the point, the Court will assume Lin has met his burden to establish a prima facie case of retaliation for his 2015 HR complaint.

Second, Lin alleges that after he filed his EEOC charge in August 2016, he was placed on a PIP, issued corrective actions "for fictitious reasons," suspended, and ultimately terminated. (ECF No. 16, PageID.429–430.)

Henry Ford does address the allegations related to Lin's EEOC complaint, arguing that Lin cannot meet the causation requirement of a prima facie case because there is no evidence that Lin was disciplined or terminated because he filed the complaint. (ECF No. 14-1, PageID.82.)

A plaintiff's burden in establishing a prima facie case is intended to be "a burden easily met." *Steiner v. Henderson*, 121 F. App'x 622, 627 (6th Cir. 2005) (quoting *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)). But the plaintiff must provide *some* evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (quoting *EEOC v. Avery Dennison Corp.*,

104 F.3d 858, 861 (6th Cir. 1997)). And to establish causation sufficient to establish a prima facie case, Lin must demonstrate that but for his EEOC complaint, Henry Ford would not have disciplined or terminated him. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Redlin*, 921 F.3d at 614.

Timing does not help Lin establish but-for causation. True, when an adverse action occurs shortly after a protected activity, temporal proximity may be "significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) ("[O]ur case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference."). But in Lin's case, because there is a significant lapse of time between the protected activity of filing an EEOC complaint and the discipline beginning seven months later (and the termination was 14 months later), Lin must present evidence of retaliatory conduct to establish causation. *Mickey*, 516 F.3d at 525.

In other cases, plaintiffs have shown causation by pointing to indicia of retaliatory conduct such as verbal threats, disparate treatment, or heightened scrutiny. *See, e.g.*, *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (finding temporal proximity combined with verbal threats from manager supported finding of causation); *Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 435-36 (6th Cir. 2009) (explaining that an employer cannot conceal retaliatory motive by heightening its scrutiny of the employee and waiting for or contriving an ostensibly legal basis for the adverse employment action); *Hazel v. Quinn*, 933 F. Supp. 2d 884, 888 (E.D. Mich. 2013)

(noting that disparate treatment of similarly situated individuals can be evidence of retaliatory motive).

Lin tries to suggest that he was subjected to heightened, unwarranted scrutiny after his complaint, but the record does not support this. Lin received four of his five corrective actions *before* he filed the EEOC complaint. And the other evidence of alleged retaliation that Lin points to did not begin until seven months after filing his EEOC charge, when Lin was placed on a PIP. Lin does not present any evidence other than his own stated belief that the PIP, corrective actions, suspension, or termination were in retaliation for his filing of the EEOC complaint.

On the other hand, Henry Ford has a long paper trail and sworn statements by two employees that support their explanation of good cause for the disciplinary actions and, ultimately, termination. *See, e.g.*, *Vereecke*, 609 F.3d at 401 (finding the plaintiff could not establish causation where "the absence of close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive"); *see also Steiner*, 121 F. App'x at 628 ("A plaintiff must provide *some* evidence beyond temporal proximity to demonstrate a retaliatory causal connection, especially where a defendant provides compelling evidence of alternative causation."). Ultimately, Lin does not offer sufficient evidence from which a jury could reasonably infer Henry Ford would not have disciplined or terminated Lin but for his EEOC complaint. So he fails to establish a prima facie case of retaliation for his EEOC complaint.

## 2.

Since Lin has established a prima facie case of retaliation for his 2015 HR complaint, "[t]he burden then shifts to [Henry Ford] to produce evidence of a legitimate, nondiscriminatory reason

for its actions." *Imwalle*, 515 F.3d at 544. Any reasonable jury would find that Henry Ford has offered sufficient evidence of a legitimate reason for each of the allegedly adverse actions.

After Lin complained to HR about the Level 3 promotions, he received his first corrective action about two months later, on August 10, 2015. (ECF No. 14-3, PageID.203.) The corrective action alleges that "there have been several issues with [Lin] telling people that Dan, a level 3 technician, is not capable of his job. This has been spoken loud enough for Dan to hear it and is making a hostile workplace for Dan." (*Id.*) The contemporaneous documentation of the corrective action reflects legitimate reasons for disciplining Lin: namely a coworker had complained Lin was creating a hostile work environment. This is sufficient evidence to shift the burden back to Lin to show the stated reason was pretextual.

The other corrective actions Lin received were all issued for documented violations of a rule or policy. The October 30, 2015 corrective action was issued for "non compliance with departmental call handling policy, issues with team work and insubordination." (ECF No. 14-3, PageID.204.) The two November 16, 2015 corrective actions were for "3rd offense insubordination" when Lin called Irons a liar in front of other employees and then walked out in the middle of a meeting. (*Id.* at PageID.205–206.)

The extensive contemporaneous documentation of performance issues and policy violations, paired with the testimony of Irons and Amos, is sufficient to meet Henry Ford's burden to produce a legitimate, nondiscriminatory reason for Lin's discipline and termination.

### 3.

In the final step of the *McDonnell Douglas* test, Lin must "demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544; *see also Seeger v.*

*Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515)).

As with a discrimination claim, Lin can demonstrate pretext in a number of ways, including by showing the proffered reason "(1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Upshaw*, 576 F.3d at 586. Lin seems to follow the first approach here.

Lin has not offered any evidence beyond his own assertions to refute the legitimate reasons offered by Henry Ford to justify their discipline of Lin or to show that retaliation was the true motivation for the discipline. When asked in his deposition about the alleged reasons for his discipline and termination, Lin repeatedly denied the underlying conduct or stated he did not remember. But Lin did not present any evidence, such as documentation or statements by co-workers, to back up his assertions. So Lin has not met his burden of showing Henry Ford's proffered reasons for disciplining Lin were pretextual.

Moreover, Henry Ford raises the "honest belief rule," which states that "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012). The key inquiry is "'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)).

The evidence offered by Henry Ford shows that they made the decision to terminate Lin only after multiple years of documented performance issues and a concerted effort to pursue other options short of termination. Henry Ford's proffered reasons can be considered honestly held

27

because the evidence shows the company "reasonably relied on particularized facts that were before it at the time the [disciplinary] decision[s] [were] made." *Seeger*, 681 F.3d at 285 (internal citations and alterations omitted). Once the employer establishes it had a honest belief in the reasons for taking action against the plaintiff, "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Tingle*, 692 F.3d at 531 (citing *Seeger*, 681 F.3d at 285).

Because Lin offers no evidence beyond his bare assertions to rebut Henry Ford's legitimate nondiscriminatory reasons for disciplining and terminating him, he fails to create a genuine issue of material fact and Henry Ford is entitled to judgment as a matter of law on Lin's retaliation claim under Title VII.

### 4.

As with Lin's discrimination claims, the parties apply the same legal framework for Lin's retaliation claims under Title VII and ELCRA. So the Court finds Henry Ford is entitled to summary judgment on Lin's retaliation claim under ELCRA.

### IV.

For the reasons given, the Court GRANTS Henry Ford's motion for summary judgment (ECF No. 14) on all counts and Lin's case is DISMISSED.

SO ORDERED.

Dated: May 4, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 4, 2020.

s/Erica Karhoff
Case Manager to the
Honorable Laurie J. Michelson